UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD E. HODGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07CV1036 TIA |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review

of the denial of plaintiff's applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties

consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## Procedural History

On October 3, 2003, Plaintiff filed an application for Disability Insurance Benefits (DIB),

alleging disability beginning April 20, 2003 due to a bad heart, high blood pressure, arthritis, bad

back, heart attack three years ago, and a heart that does not pump right. (Tr. 90-92; 65) On February

6, 2004, Plaintiff filed an application for Supplemental Security Income (SSI) alleging the same onset

date. (Tr. 32-34) The applications were denied,[1] and Plaintiff requested a hearing by an

Administrative Law Judge (ALJ). (Tr. 36-37; 65-69; 63) On December 14, 2004, Plaintiff testified

at a hearing before an ALJ. (Tr. 500-525) In a decision dated March 17, 2005, the ALJ determined

---

[1] The Social Security Administration denied Plaintiff's request for SSI based upon the fact
that Plaintiff, or Plaintiff and his spouse, had a monthly income that was too high for SSI
payments in Missouri. (Tr. 36)

that Plaintiff was not under a disability at any time through the date of decision. (Tr.12-19) On April 27, 2007, the Appeals Council denied Plaintiff's request for review. (Tr. 4-7) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff entered the room with a cane, limping and walking poorly. The ALJ noted that Plaintiff's complaints included heart problems, high blood pressure, arthritis, back problems, and cardiomyopathy. Plaintiff's attorney also stated that Plaintiff had a recent diagnosis of diabetes. Plaintiff also had two carpel tunnel surgeries and emphysema. (Tr. 503)

The ALJ first questioned Dr. Morris Alex, a board certified medical doctor, particularly qualified in internal medicine. Dr. Alex testified that he had looked at Plaintiff's medical file and additional up-to-date records provided by Plaintiff's attorney. Dr. Alex never treated nor examined Plaintiff. The ALJ noted that Plaintiff was 45 years old with a ninth grade education. Plaintiff worked as a honer, or machine operator, in a factory. His duties included boring cylinders for diesel trucks. (Tr. 504-506)

In response to the ALJ's question regarding Plaintiff's limp, Dr. Alex responded that nothing in the file indicated that Plaintiff was told to use a cane, nor did anything in the file explain why Plaintiff limped and had difficulty walking into the room. With regard to Plaintiff's heart problems, Dr. Alex testified that, although the Plaintiff stated that he had coronary artery disease, the cardiac catheter showed no evidence of this. Plaintiff's diagnosis of cardiomyopathy indicated a dysfunction of the heart muscle. However, there was no evidence of a prior heart attack. Although Plaintiff's heart was not pumping well, more recent testing showed a left ventricular ejection fraction of 40% was at

the low limits of normal and did not preclude working. Dr. Alex noted that one of Plaintiff's physicians, Dr. Phillips, stated that Plaintiff had systemic changes that were compatible with peripheral neuropathy. However, Dr. Phillips submitted no other diagnostic information. These changes would not affect Plaintiff's back, and Dr. Alex opined that no objective evidence in the file demonstrated that Plaintiff could not walk properly. (Tr. 507-510)

The ALJ questioned Plaintiff regarding his gait. Plaintiff stated that he hurt his back years ago and that Dr. Fitzgerald advised Plaintiff to use a cane as needed because Plaintiff's legs went numb. Plaintiff explained that when he woke up that morning, his back was "killing" him. Dr. Alex testified that foot and leg pain, along with swelling of the feet and legs, could cause muscular stress and back pain. However, Dr. Alex also noted that Dr. Phillips found no cause for Plaintiff's loss of vibration and pinprick sensation in Plaintiff's feet. In addition, nerve conduction studies demonstrated peripheral neuropathy, but not to the severity that would require a cane. (Tr. 510-512)

With regard to Plaintiff's carpal tunnel surgeries on both hands, Dr. Alex noted that records from Dr. Rottler demonstrated that the surgeries were successful. Dr. Alex additionally stated that Plaintiff did have diabetes, which was of recent origin. Plaintiff took insulin for his diabetes. Dr. Alex testified that obesity was also a factor. Further, the ALJ noted that Plaintiff's physician stated that Plaintiff could lift 35 pounds occasionally and 20 pounds frequently, yet he found Plaintiff totally disabled. Dr. Alex explained that some medical records were contradictory regarding Plaintiff's limitations. Aside from the heart doctor's note that Plaintiff could not work because of cardiomyopathy, there was no evidence to support this conclusion. (Tr. 512-514)

Plaintiff's attorney also questioned the Medical Expert, Dr. Alex, who testified that Plaintiff did not have a heart attack, merely a heart condition. Plaintiff's previous 29% ejection fraction would

have met a listing; however, his most recent ejection fraction was up to 40%. Dr. Alex stated that the

40% ejection fraction would limit Plaintiff's ability to perform excessively heavy work. (Tr. 514-515)

The attorney also examined Plaintiff regarding his alleged disability. Plaintiff testified that his back

and legs caused limitations in that he could be walking, and they would suddenly give out. He used

a cane for safety precautions to prevent him from falling down. Plaintiff's back limited his ability to

bend and squat. If he squatted, Plaintiff needed something to grab hold of to get back up. Plaintiff

stated that Dr. Fitzgerald indicated that a cane would probably help. Plaintiff further noted that his

ejection fraction improved after he ceased working. Dr. Alex acknowledged that stress would have

an effect on Plaintiff's ejection fraction. (Tr. 515-516)

With regard to his back problems, Plaintiff testified that his back had been hurting off and on

since his injury. He stated at sometimes he experienced tingling and pain down his legs to the point

that he could not take it anymore. Plaintiff reported that he received Workman's Compensation and

that a specialist told him that he had resulting arthritis in his back. Plaintiff explained that he

experienced pain every day. He tried to mow the lawn over the summer but had to quit because of

chest pains. Plaintiff's typical day consisted of getting up and taking a shower. Although he had some

problems bending, he was able to shower without any problems. Plaintiff experienced good days and

bad days. He had bad days at least twice a week, which consisted of pain and tension running up and

down his back all the way up to his neck and shoulders. Plaintiff described the tension as somebody

twisting all his muscles. Plaintiff took a lot of Flexeril for the pain, which sometimes helped.

However, the medication made him very tired and sometimes knocked him out like a sleeping pill.

After reporting this to his doctor, the doctor recommended that Plaintiff take less medication.

However, when Plaintiff took less, he did not get as much relief. On a bad day, Plaintiff took his

medication and sat around. Occasionally, Plaintiff cooked and did the dishes. He did not do the grocery shopping but sometimes pushed the cart. (Tr. 516-519)

Plaintiff testified that he lived with his brother, his brother's wife, and their two children. The wife performed the household chores, and the children had some chores also. On a good day, Plaintiff did the dishes, cooked, and straightened up the house. He sometimes vacuumed, but vacuuming was a chore for the children. Plaintiff testified that he did not have any problems vacuuming because the vacuum was self-propelled. Plaintiff also took naps during the day. He estimated taking two naps per week. He tried not to nap, however, because he wanted to get sleep at night. Plaintiff testified that he had difficulty sleeping at night but that he did not know why. He woke up every night because of pain and to use the restroom. During the day, Plaintiff watched TV and played his nephew's video games. He also played cards and lay down and look at the ceiling. Plaintiff occasionally obtained total relief from his back pain when he moved a certain way or lay down. (Tr. 519-521)

The ALJ asked about the cause of Plaintiff's back pain. Dr. Alex noted that, other than arthritis, the medical evidence showed that foot and leg swelling could also cause back problems. However, only some notes in the file indicated that Plaintiff complained of back pain, and there was nothing to support those complaints in the record. Dr. Alex stated that everything in file pertained primarily to Plaintiff's carpal tunnel, cardiomyopathy, and diabetes. The ALJ also inquired about possible environmental restrictions on Plaintiff's ability to work. Dr. Alex answered that individuals with cardiomyopathy needed to avoid working with heights, extreme temperature, and high humidity. Dr. Alex also noted that Plaintiff's obesity was another factor putting him at risk. Plaintiff was a level 3 obesity with an index of 41. Normal index was around 24. Dr. Alex additionally testified that obesity might be a factor regarding Plaintiff's complaints about his back and legs. Dr. Alex stated that

whether Plaintiff's obesity caused any restrictions needed further evaluation or evidence to submit to the court. Dr. Alex further testified that, as far as Plaintiff's hands were concerned, Plaintiff was able to work. Plaintiff's attorney requested a consultative examination, which the ALJ denied. The ALJ also denied the attorney's request to hold the record open, stating that Plaintiff could file a new claim if the ALJ denied the present claim. (Tr. 521-524)

## **Medical Evidence**

On April 23, 2001, a cardiac catheterization revealed an ejection fraction of 29%, which the physician described as severe left ventricular dysfunction. Dr. Robert B. Lehman recommended aggressive risk factor modification; medical management; and an ACE inhibitor. (Tr. 172)

Dr. Daniel Phillips examined Plaintiff on July 18, 2001. Dr. Phillips summarized that his findings were consistent with an underlying peripheral neuropathy manifested by loss of vibration and pinprick in the feet and the slowed peroneal motor conduction velocity with an absence of the right superficial peroneal and sural sensory responses. These findings continued in the upper extremities as well, with borderline slowed motor conduction velocities and low voltage sensory responses. Dr. Phillips noted that many patients with this type of underlying neuropathy benefit from carpal tunnel decompression. (Tr. 147-148) A bone scan performed on that same date revealed multiple areas of abnormal bony uptake in the wrists and hands, most likely related to osteoarthritis. (Tr. 163)

Plaintiff underwent right open carpal tunnel release on October 2, 2001. (Tr. 331-332) He underwent left open carpal tunnel release on October 16, 2001. (Tr. 326-327)

On May 13, 2002, Dr. Phillips again examined Plaintiff. Plaintiff reported that the numbness in the first three fingers had resolved. However, he continued to experience numbness in his right fourth and fifth fingers and a little on the left side. Dr. Phillips noted that there had been

improvement. He opined that Plaintiff would benefit from an ulnar nerve decompression. (Tr. 270) Plaintiff underwent a right ulnar nerve anterior submuscular transposition for right cubital tunnel syndrome on October 29, 2002. (Tr. 305-306) He underwent left ulnar nerve anterior submuscular transposition on December 5, 2002. (Tr. 297-298)

On March 12, 2003, Plaintiff participated in a Resting Cardiac Gated Blood Pool Study which revealed a resting left ventricular ejection fraction of 43%. Normal resting left ventricular ejection fraction was considered to be 50% or greater. No focal wall motion abnormalities were identified. (Tr. 160)

On March 14, 2003, Plaintiff received a blocking splint for his right middle finger trigger. Plaintiff complained of triggering especially with heavy gripping and picking up compressor blocks at work. (Tr. 369)

An ECG performed on March 17, 2003 revealed an ejection fraction of 40%. Plaintiff's RV function was low normal. His left atrial appendage appeared to be free of abnormal echo density, and his aortic valve was a 3 cusp structure without gross abnormality. Dr. John R. Groll noted no obvious aortic valve insufficiency, and Plaintiff's mitral valve was a thin leaflet structure without gross structural abnormality. Dr. Groll noted some mild to moderate mitral regurgitation and moderate tricuspid regurgitation. He also found a lipomatous infiltration of the intra-arterial septum. Dr. Groll noted no other abnormalities. (Tr. 155-156)

On October 9, 2003, Jerry L. Fitzgerald, D.O., advised that Plaintiff was not a candidate for gainful employment due to cardiomyopathy. (Tr. 198) A note dated November 13, 2003 from Dr. Stoecker on behalf of the SSA requested that the agency ask Plaintiff where his pain is and how it limits him. If the pain was significantly limiting, Dr. Stoecker stated that the agency needed a

consultative examination for range of motion, a neurological exam, straight leg raising examination, and an x-ray of the back. (Tr. 102)

Plaintiff exhibited a moderate breathing restriction after a spirometry dated January 15, 2004. (Tr. 245) Also on January 15, 2004, Dr. Mark A. Lichtenfeld examined Plaintiff. Dr. Lichtenfeld additionally reviewed Plaintiff's medical records and prior claim form the Division of Worker's Compensation. In a report dated February 25, 2004, Dr. Lichtenfeld diagnosed bilateral carpal tunnel syndrome and status post bilateral carpal tunnel release, which caused a 32.5% permanent partial disability at the level of the left wrist and a 27.5% permanent partial disability at the level of the right wrist. Dr. Lichtenfeld opined that these two disabilities combined to form an overall disability greater than the simple sum of the disabilities combined. Further, due to pre-existing conditions predating Plaintiff's arm injuries, Dr. Lichtenfeld diagnosed the following: (1) a 35% permanent partial disability resulting from Plaintiff's cardiovascular disease; (2) a 25-27.5% permanent partial disability resulting from hypertension and the obvious complications of retinopathy and cardiomegaly; a 30% permanent partial disability due to Plaintiff's COPD, as well as subjective complaints and loss of lung function; and a 22.5% permanent partial disability due to scoliosis, chronic lumbar spine back pain, and back dysfunction. The combination of these disabilities formed an overall disability greater than the simple sum of the disabilities combined. Dr. Lichtenfeld opined that these disabilities created a significant obstacle and/or hindrance to Plaintiff obtaining employment or re-employment. (Tr. 233-243)

Dr. Lichtenfeld also noted that Plaintiff suffered from bilateral chronic medial epicondylitis in the elbows and was status post bilateral ulnar nerve transposition. He opined that Plaintiff had a 32.5% permanent partial disability at the level of the left elbow and a 27.5% permanent partial disability at the level of the right elbow. Because the same joint was affected in both upper

extremities, a loading factor of 7.5% should be added. Dr. Lichtenfeld repeated his diagnosis and disability ratings based on Plaintiff's pre-existing conditions. Dr. Lichtenfeld further recommended the following work restrictions: (1) avoid all repetitive activities in both upper extremities with his hands and forearms; (2) avoid all types of hand intensive activities; (3) avoid using electric, gas, or air powered tools; (4) avoid using torquing tools as well as impact tools; (5) avoid lifting more than 35-40 pounds on a one-time-basis or 15-20 pounds repetitively; (6) avoid repetitive gripping and grasping; and (7) avoid rotational stress to the wrists. Dr. Lichtenfeld also recommended wrist splints and elbow pads if Plaintiff's symptoms increased. Taking into account Plaintiff's educational background, vocational history, pre-existing conditions, and injuries from the workplace, Dr. Lichtenfeld opined that Plaintiff was totally and permanently disabled and unable to compete in the open labor market. (Tr. 243-244)

A Gated Blood Pool Study dated March 15, 2004 revealed an ejection fraction of 44% and splenomegaly. The physician noted Plaintiff's medical history of CAD, hypertension, and cardiomyopathy. (Tr. 445)

Treatment notes from Nurse Practitioner Chauvin dated May 7, 2004 revealed that Plaintiff complained that his back hurt most days; his knees and feet always hurt; and his feet were numb. Plaintiff's weight was 315 pounds. Nurse Chauvin also noted diabetes mellitus neuropathy and increased Plaintiff's Neurontin dose. (Tr. 431) On June 15, 2004, Nurse Chauvin again noted diabetes mellitus neuropathy. Plaintiff complained of swelling and pain in his feet and legs. Nurse Chauvin increased Plaintiff's dose of Neurontin. (Tr. 430) On July 23, 2004, Plaintiff complained of continuing pain in his tailbone and edema in his feet and ankles. Plaintiff's blood sugars were 100-140. Nurse Chauvin again increased Plaintiff's dose of Neurontin. (Tr. 429)

Also on July 23, 2004, Dr. Fitzgerald completed a Physician's Statement for Disabled Person's Plates/Placard. Dr. Fitzgerald noted that Plaintiff was severely limited in his ability to walk due to arthritic, neurological, or orthopedic condition. He also marked the box stating that this was a permanent disability. (Tr. 421)

Plaintiff returned to Nurse Chauvin on August 5, 2004. Plaintiff requested an increase in his Neurontin dose for leg pain, which Nurse Chauvin granted. (Tr. 428) On December 9, 2004, Nurse Chauvin discussed a TENS unit with Plaintiff. She also noted increased swelling in Plaintiff's legs and recommended physical therapy. (Tr. 425)

Also on December 9, 2004, Nurse Chauvin completed a Physical Residual Functional Capacity Questionnaire, wherein she listed Plaintiff's diagnoses as cardiomyopathy, diabetes, emphysema, osteoarthritis, hyperlipidemia, obesity, and coronary artery disease. She opined that Plaintiff's prognosis was fair to poor and listed Plaintiff's symptoms as shortness of breath, decreased exercise tolerance, and neuropathy. Nurse Chauvin noted occasional low back pain with exertion, and she mentioned Plaintiff's need to take muscle relaxers. Side effects from medication included drowsiness and dizziness. Further, Nurse Chauvin opined that Plaintiff's impairments lasted or could be expected to last at least twelve months. In addition, these impairments were reasonably consistent with Plaintiff's symptoms and functional limitations. Nurse Chauvin stated that Plaintiff's pain or other symptoms were severe enough to interfere with his attention and concentration frequently during a typical workday. Plaintiff was maybe capable of low stress jobs. However, Nurse Chauvin also opined that Plaintiff could not walk any city blocks without rest or severe pain. He could sit for 30 minutes at a time before needing to get up and could stand 5 minutes at one time before needing to sit down or walk around. (Tr. 449-451)

In an 8-hour workday, Nurse Chauvin stated that Plaintiff could sit or stand/walk for a total less than 2 hours. During such workday, Plaintiff would need to walk around every 30 minutes for a period of 3 minutes. Plaintiff required a job that permitted shifting positions at will and taking unscheduled breaks every hour for 15 to 20 minutes. In addition, Plaintiff needed to elevate his leg to the knee-hip level 80% of the time. Nurse Chauvin additionally noted that Plaintiff must use a cane or other assistive device. Further, Nurse Chauvin opined that Plaintiff could only occasionally lift 10 pounds, look down, look up, twist, or stoop. Plaintiff could never crouch/squat, climb ladders, or climb stairs. In addition, Plaintiff's impairments were likely to produce "good days" and "bad days". Nurse Chauvin estimated that Plaintiff was likely to be absent from work more than four days per month. Other limitations included the need to avoid fumes and extreme temperatures. (Tr. 451-453)

A Two-Dimensional Echocardiographic/M-Mode/Doppler Study performed on March 2, 2005 revealed an ejection fraction of 45%. There also was mild to moderate left ventricular systolic dysfunction with mild diastolic dysfunction and moderate left ventricular enlargement and left atrial enlargement. The study also revealed mild mitral valve prolapse and a reversal of mitral inflow consistent with diastolic dysfunction and mild to moderate mitral and tricuspid regurgitation. The findings were consistent with dilated cardiomyopathy. Additional diagnoses were hypertension and diabetes. (Tr. 493)

Treatment notes dated February 25, 2005 from Chad J. Smith, D.O., revealed edema and Diabetes Mellitus type II. Plaintiff also complained of chronic low back pain. (Tr. 494) On March 10, 2005, Plaintiff underwent an x-ray of the lumbar spine. The results showed degenerative changes and scoliosis with mild deformity of the right side of the L3 vertebral body which was likely

secondary to the scoliosis versus an old injury. (Tr. 489)

### The ALJ's Determination

In a decision dated March 17, 2005, the ALJ determined that the Plaintiff met the disability insured status requirements of the Act on April 20, 2003, the date he alleged he became unable to work, and continued to meet them through December 31, 2008. Plaintiff had not engaged in substantial gainful activity since April 20, 2003. Further, the ALJ found that Plaintiff suffered from mild cardiomyopathy, recent onset of diabetes mellitus, and a history of carpal tunnel syndrome but that he did not have an impairment, or combination thereof, listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 18)

The ALJ determined that Plaintiff's allegations of symptoms precluding all of his past relevant work were not consistent with the evidence as a whole and were unpersuasive. Instead, the ALJ found that Plaintiff possessed the residual functional capacity to perform the physical exertion of work except for lifting over ten pounds frequently and twenty pounds occasionally. Further, the ALJ stated that Plaintiff's past relevant work as a machine operator did not require work-related activities precluded by these lifting limitations. Thus, Plaintiff's impairments did not prevent him from performing his past relevant work. Because the Plaintiff did not sustain his burden of showing that he could not perform his past relevant work, the ALJ determined that Plaintiff was not under a disability as defined by the Act at any time through the date of the decision. The ALJ concluded that Plaintiff was not entitled to a Period of Disability or Disability Insurance Benefits under the Social Security Act, nor was he eligible for Supplemental Security Income Benefits under the Act. (Tr. 19)

Specifically, the ALJ noted Dr. Alex' testimony that no objective evidence suggested that Plaintiff could not walk normally and that the results of nerve conduction studies were not severe

enough to require a cane. (Tr. 14) The ALJ also assessed the medical evidence related to Plaintiff's back pain and found that the record failed to demonstrate that the Plaintiff had any medically determinable impairment that could be reasonably expected to cause severe pain as alleged by the Plaintiff. (Tr. 14-16) The ALJ concluded that Plaintiff did not have a severe medically determined impairment involving his back that would preclude him from work. (Tr. 16)

The ALJ further noted that Plaintiff had carpal tunnel syndrome but did not allege disability as a result of this impairment. With regard to Plaintiff's heart problems, the ALJ found that Plaintiff worked after his alleged "heart attack". In addition, the month prior to Plaintiff's alleged onset date, his left ventricular ejection fraction was forty-three percent. According to Dr. Alex, this would preclude work at the excessively heavy exertional level, not a lighter exertional level. The ALJ found that Plaintiff's cardiomyopathy had not deteriorated but had improved. Thus, the ALJ gave no weight to Dr. Fitzgerald's opinion regarding Plaintiff's inability to work due to cardiomyopathy. (Tr. 16-17)

The ALJ found that, although Plaintiff's attorney requested a consultative orthopaedic examination for Plaintiff's alleged severe, incapacitating back pain, the Plaintiff had the burden of establishing a severe impairment and proving his residual functional capacity (RFC). The ALJ concluded that the record failed to demonstrate that Plaintiff was not capable of performing his past relevant work. Thus, the ALJ denied the request for a consultative evaluation. (Tr. 17-18)

The ALJ assessed Plaintiff's past relevant work, noting that Plaintiff had a good earnings record. According to the Disability Report, Plaintiff stopped working because he was laid off. Further, Plaintiff collected Unemployment Benefits, demonstrating that he was ready, willing, and able to work and actively seeking employment. (Tr. 18)

The ALJ determined that, in light of the clinical and objective findings and Plaintiff's

13

testimony, Plaintiff was able to perform at least the full range of light work. Plaintiff was able to sit, stand, walk, and occasionally lift up to ten pounds. The ALJ found that Plaintiff past work as a machine operator, as described in his Vocational Report, was at the light exertional level. Therefore, the Plaintiff did not sustain the burden of proving that he could not perform his past relevant work. Thus, the ALJ concluded that Plaintiff was not entitled to a Period of Disability, Disability Insurance Benefits, or Supplemental Security Income Benefits. (Tr. 18-19)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th

Cir. 1996) (quoting <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record <u>de novo</u>. <u>Id</u>. at 1328 (citing <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. <u>Id</u>. at 1320; <u>Clark v. Chater</u>, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-586 (8th Cir. 1992); <u>Brand v. Secretary of Health Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. <u>Id</u>. at 1354; <u>Ricketts v. Secretary of Health & Human Servs.</u>, 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the <u>Polaski</u>[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

### Discussion

The Plaintiff first argues that the ALJ erred by failing to properly consider the requirements of Plaintiff's past relevant work; failing to call a vocational expert; failing to properly assess the opinions of treating physicians; and failing to fully and fairly develop the record. In response, Defendant contends that Plaintiff failed to meet his burden of showing that he was unable to perform his past relevant work at step four. Defendant further asserts that vocational expert testimony was not required in this case because the ALJ made his determination at step four of the sequential evaluation process. In addition, Defendant argues that the ALJ properly evaluated ths medical opinions in the record. Finally, Defendant maintains that the ALJ fulfilled his duty to develop the record.

The undersigned finds that substantial evidence does not support the ALJ's determination; thus, the decision should be reversed and the case remanded for further proceedings. Although the ALJ found that Plaintiff could perform his past relevant work as a machine operator, as described in his vocational report, the ALJ made only a conclusory determination, contrary to Eighth Circuit law.

---

[2]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

When evaluating whether a claimant is able to return to his past work:

> The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity. The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. . . . A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work.

Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) (citations omitted).

Here, although the ALJ relied on Plaintiff's own statements contained in his vocational report, the ALJ did not make **explicit** findings regarding the actual physical and mental demands of Plaintiff's past work. At no time during the hearing did the ALJ question Plaintiff about such past work demands. Instead, the ALJ merely stated in his opinion that "[t]he claimant's prior work as a machine operator described in his Vocational Report, was at the light exertional level . . . With a residual functional capacity to perform at least the full range of light work, the claimant did not sustain his burden of proving he cannot perform his past relevant work." (Tr. 18) Plaintiff reported that his past work as a machinist required walking, standing, stooping, kneeling, crouching, handling, grabbing or grasping big objects and reaching. (Tr. 119) He used machines, tools, or equipment. (Tr. 119) Plaintiff was not explicit about what he lifted, how far he carried it, and often he did this, as lifting and carrying depended on what job or department he was assigned. (Tr. 119) However, he did state that the heaviest weight lifted was 20 pounds, and the weight he frequently lifted was 10 pounds. (Tr. 119)

The ALJ did not assess any of these demands, other than Plaintiff's purported lifting

requirements, nor did he compare the actual demands of Plaintiff's past work with Plaintiff's residual functional capacity. "Residual functional capacity 'is not the ability to merely lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" Ingram v. Chater, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). In Ingram, the Eighth Circuit Court of Appeals found that a brief discussion of the plaintiff's past job duties along with reliance on the plaintiff's description of this work was insufficient, finding that the court was unable to determine whether the ALJ considered the medical reports under the correct legal standard. Id. at 605.

In the present case, the non-examining medical expert,[3] Dr. Alex, upon whose opinion the ALJ exclusively relies, stated that Plaintiff needed to avoid working on heights, extremes of temperature, and high humidity. (Tr. 522) In addition, Dr. Alex opined that Plaintiff's extreme weight was a factor, as Plaintiff was a level 3 of obesity, putting in at risk according to the new criteria. (Tr. 522) Dr. Fitzgerald, Plaintiff's treating and examining physician, opined that Plaintiff was severely limited in his ability to walk due to his arthritic, neurological, or orthopedic condition, warranting Disabled Person's Plates/Placard. (Tr. 421) The ALJ failed to include these limitations in Plaintiff's RFC and failed to assess whether Plaintiff's past work as a machine operator included these factors.[4]

---

[3] Opinions of non-examining doctors ordinarily do not constitute substantial evidence on the whole. Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002).

[4] If the ALJ was dissatisfied with Dr. Fitzgerald's explanations, he could and should have sought further information. "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations by treating physicians and others, and claimant's own descriptions of his limitations." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citation omitted). "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.

Thus, the undersigned finds that this case should be remanded to the ALJ. On remand, the ALJ may want to consider Plaintiff's obesity as a non-exertional impairment, given the supporting medical evidence of obesity in the record. In addition, if the ALJ determines that Plaintiff cannot return to his past relevant work as a machine operator, the ALJ should utilize a vocational expert in considering whether Plaintiff can perform other jobs available in the national economy. See Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (obesity is a non-exertional impairment which may significantly limit a plaintiff's ability to perform the full range of work such that a vocational expert should consider its impact). Therefore, substantial evidence does not support the ALJ's determination, and this case should be remanded to the ALJ for further analysis consistent with this Memorandum and Order. See Lowe v. Apfel, 226 F.3d 969, 974 (8th Cir. 2000) (remanding case where ALJ failed to examine specific duties of plaintiff's past relevant work and suggesting that the ALJ consider additional evidence).

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for

---

2000). Additionally, "[t]he ALJ has a duty to develop facts fully and fairly, even where, as here, the claimant is represented by counsel." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000).

In Bowman v. Barnhart, the Eighth Circuit Court of Appeals stated that "the ALJ was obligated to contact [plaintiff's treating physician] … for 'additional evidence or clarification,' … and for an assessment of how the 'impairments limited [plaintiff's] ability to engage in work-related activities.'" 310 F.3d 1080, 1085 (8th Cir. 2002) (quoting Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001)). Indeed, an ALJ has the duty to ask plaintiff's doctors to comment on his ability to function in the workplace, as the ALJ "may not draw upon his own inferences from medical reports" in assessing plaintiff's RFC. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (quotation omitted).

further proceedings consistent with this Memorandum and Order.


                                        _____/s/ Terry I. Adelman_____
                                        UNITED STATES MAGISTRATE JUDGE


Dated this ___24th___ day of <u>September</u>, 2008.